IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| COLETTE MARIE LOVER, | ) | |
| | ) | CASE NO. 5:13-CV-1861 |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KENNETH S. McHARGH |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | **MEMORANDUM OPINION &** |
| | ) | **ORDER** |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to the consent of the parties. (Doc. 16).

The issue before the undersigned is whether the final decision of the Commissioner of Social

Security ("Commissioner") denying Plaintiff Colette Lover's ("Plaintiff" or "Lover") application

for a Period of Disability and Disability Insurance benefits under Title II of the Social Security

Act, 42 U.S.C. §§ 416(i) and 423, is supported by substantial evidence and, therefore,

conclusive.

For the reasons set forth below, the Court VACATES the Commissioner's decision and

REMANDS the case back to the Social Security Administration.

## I.  PROCEDURAL HISTORY

Lover filed an application for Disability Insurance benefits on July 22, 2010, with a

protective filing date of July 9, 2010. (Tr. 90-93, 112).  Plaintiff alleged she became disabled on

June 1, 2008 due to suffering from fused discs in her spine and herniated discs. (Tr. 90, 116).

The Social Security Administration denied Lover's application on initial review and upon

reconsideration. (Tr. 74-77, 82-87).

At Plaintiff's request, administrative law judge ("ALJ") Virginia Robinson convened an administrative hearing on March 6, 2012 to evaluate her application. (Tr. 23-51).  Plaintiff, represented by counsel, appeared and testified before the ALJ. (*Id*).  A vocational expert ("VE"), Mark Anderson, also appeared and testified. (*Id.*).

On March 28, 2012, the ALJ issued an unfavorable decision, finding Lover was not disabled. (Tr. 10-18).  After applying the five-step sequential analysis,[1] the ALJ determined Plaintiff retained the ability to perform work existing in significant numbers in the national economy. (*Id.*).  Subsequently, Plaintiff requested review of the ALJ's decision from the Appeals Council. (Tr. 6).  The Appeals Council denied the request for review, making the ALJ's March

---

[1] The Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability."  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The Sixth Circuit has summarized the five steps as follows:

(1)    If a claimant is doing substantial gainful activity–i.e., working for profit–she is not disabled.

(2)    If a claimant is not doing substantial gainful activity, her impairment must be severe before she can be found to be disabled.

(3)    If a claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

(4)    If a claimant's impairment does not prevent her from doing her past relevant work, she is not disabled.

(5)    Even if a claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that accommodates her residual functional capacity and vocational factors (age, education, skills, etc.), she is not disabled.

*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

28, 2012 determination the final decision of the Commissioner. (Tr. 1-5).  Plaintiff now seeks

judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  EVIDENCE

### A.  Personal Background

Lover was born on March 6, 1951 and was 58 years old on her alleged onset date, and 61

years old on the date the ALJ rendered her decision. (Tr. 28, 90).  Accordingly, she was

considered as a "person of advanced age" for Social Security purposes. *See* 20 C.F.R. §

404.1563(d).  Plaintiff has a high school education and completed two years of college. (Tr. 28,

46).  She has past relevant work as a medical transcriptionist. (Tr. 28).

### B.  Medical Evidence

Lover indicates that she has been living with chronic back pain since approximately

2005. (Tr. 191).  An MRI dated January 21, 2008 showed that Plaintiff had multilevel

degenerative spondylosis, as well as multilevel degenerative central canal and degenerative

bilateral foraminal stenosis at L5-S1 and L4-5. (Tr. 170-71).

On January 31, 2008, Lover treated with Michael Knapic, D.O., and she described

increasing back pain over the past six months, without much radicular pain. (Tr. 172).  Her

straight leg raise test caused buttock pain, but "no true radicular pain."  Dr. Knapic explained

that Plaintiff's most recent MRI showed "significant diffuse lumbar degenerative disc disease at

all levels."  He diagnosed multilevel degenerative disc disease with a disc bulge/herniation at L4-

5 and L3-4. (*Id*.).  Lover expressed a desire to avoid surgery, and Dr. Knapic referred her to

Michael F. Stretanski, D.O., for pain management. (Tr. 172).

On February 15, 2008, Plaintiff presented to Dr. Stretanski, who expressed concern that

Plaintiff would eventually have to undergo a lumbar discectomy, given the obliteration of her

lateral foramen. (Tr. 173-74).  Dr. Stretanski provided an epidural injection. (Tr. 174).  On March 14, 2008, Lover reported pain in her axial spine, with no radicular features. (Tr. 175).  Dr. Stretanski noted that Plaintiff had done "extremely well for a few hours or a few days after the posterior element infiltration," but that Plaintiff expressed she did not feel better overall.  The doctor performed a medial branch regional infiltration. (*Id.*)

On May 8, 2008, Lover reported to Dr. Knapic that she experienced "some relief" with Dr. Stretanski's initial injections. (Tr. 176).  A physical exam revealed "primarily low back pain but no leg pain," and a negative straight leg raise. (*Id.*)

Lover also received treatment at the Pain Management Clinic at Wooster Community Hospital. (Tr. 181).  In April 2009, Plaintiff received an epidural steroid injection.  One week after the injection, Lover reported to Ayman H. Basali, M.D., that she felt 50 percent improvement of her symptoms to the lower lumbar region due to the injection.  Plaintiff complained mostly of "radicular symptoms to the lower extremity right side from the buttock area all the way down to her heel with a dull achy sensation associated with some tingling and numbness."  Lover's physical exam indicated a limited range of motion in the lumbar spine, a positive straight leg raise on the right side at 40 degrees, and a markedly antalgic gait favoring the left side.  Dr. Basali assessed mechanical low back pain, degenerative disk disease of the lumbar spine, and radicular syndrome of the lower extremity. (*Id.*).

On August 24, 2009, Plaintiff called Dr. Basali for an "urgent appointment" due to an exacerbation of her symptoms. (Tr. 180).  Plaintiff reported low back pain radiating into the right lower extremity and was unable to sit for a prolonged period of time.  Dr. Basali believed that the injections provided only temporary relief and recommended that Plaintiff meet with Dr. Knapic

for surgical evaluation. (*Id.*).  On August 26, 2009, Dr. Basasli performed a lumbar epidural steroid injection to manage Plaintiff's pain until her surgical evaluation. (Tr. 179).

Plaintiff reported to Dr. Knapic for surgical evaluation on September 15, 2009. (Tr. 185). During the examination, she walked with a markedly left antalgic gait.  Her straight leg raise test showed buttock pain on the right and calf pain on the left. (*Id.*).

An MRI performed on September 17, 2009 revealed (1) degenerative disc disease and spondylosis involving the lumbar spine producing moderate L3-4 and moderate L4-5 central spinal stenosis, (2) broad central L4-5 disc herniation contributing to central spinal stenosis, (3) left-sided L3-4 disc herniation impinging on the left L4 nerve root in the recess, and (4) broad left-sided L2-3 disc herniation indenting the anterior aspect of the thecal sac. (Tr. 187).  Due to the severity of Lover's multilevel disease and the nature of the surgery, Dr. Knapic did not feel comfortable performing the surgery himself, and referred Plaintiff to orthopedic surgeon Nicholas Ahn, M.D. (Tr. 190).

When Plaintiff met Dr. Ahn on October 22, 2009, she reported severe back pain that ran down both of her lower extremities, as well as weakness and numbness in her legs that caused difficulty walking and standing. (Tr. 191).  A neurological examination demonstrated moderate weakness and numbness in an L4 and L5 type distribution, positive nerve root tension signs, and positive shopping cart sign in Plaintiff's walk. (*Id.*).  The doctor made note of Plaintiff's failed attempts to alleviate pain through conservative treatment. (Tr. 191-92).  Dr. Ahn opined that the surgery's chance of success was 75 percent, and "if nothing else [it] should at least prevent her from getting worse by taking the pressure off the nerves that are being crushed." (*Id.*).  On November 17, 2009, Dr. Ahn performed the lumbar fusion surgery. (Tr. 204).

Following surgery, Plaintiff underwent physical therapy. (Tr. 195). In her initial evaluation on February 2, 2010, Plaintiff informed Paul McGhee, P.T., O.C.S., that her back and right leg pain were still present. She rated her thigh and ankle pain at "5" on a "1 to 10" scale and "10" with activity. She rated her back pain as variable from "0" with complete rest and medication, to "9" with activity. (*Id.*). Upon physical examination, Plaintiff's trunk range of motion was significantly limited, she displayed generalized weakness neurologically, and her reflexes were diminished on the left side. (Tr. 196). Mr. McGhee thought her rehabilitation potential was good. (*Id.*).

As of April 9, 2010, Plaintiff had completed 19 physical therapy sessions. (Tr. 198). Plaintiff estimated her improvement at 70 percent, with her back pain varying from "5" to "8." She reported radicular pain that became severe at times, but she noticed less difficulty with mobility during activities of daily living. Mr. McGhee stated that Lover "made excellent progress with her strengthening and conditioning program." Plaintiff had moderate restriction in her range of motion, but Mr. McGhee opined that it was to be expected after spinal fusion surgery. Mr. McGhee noted that Plaintiff had a "BOA back brace," which should help with symptom relief during activity. (*Id.*).

On May 5, 2010, Plaintiff met with Salim M. Hayek, M.D., of the Division of Pain Medicine at University Hospitals Case Medical Center. (Tr. 215). Lover reported to Dr. Hayek that since the surgery, her right leg pain or numbness was about the same, but her back pain may have become worse. Lover indicated that her pain was relieved by lying down, and was exacerbated by standing or walking for extended periods. Sitting in a chair with a pillow somewhat relieved pain. Lover indicated no relief from physical therapy sessions. A TENS unit alleviated some of Lover's pain, but the relief abated when the unit was discontinued. (*Id.*).

6

A physical examination showed "mild tenderness to palpation over the lower lumbar region and some tenderness to palpation over bilateral SI joints," as well as "markedly limited flexion to only 90 degrees." (Tr. 216).  There was mild tenderness over the lower lumbar region. Dr. Hayek indicated that he was unable to elicit pain with a straight leg raise test.  Plaintiff performed heel and toe walking without difficulty. Based on Plaintiff's history, physical examination, and diagnostic imaging, Dr. Hayek diagnosed post laminectomy syndrome[2] and lumbosacral neuritis.  The doctor discussed the potential for a spinal cord stimulator or intrathecal pump placement, and adjusted Lover's medication. (*Id.*).

On May 19, 2010, Dr. Hayek administered an epidural injection. (Tr. 209).  On June 30, 2010, Plaintiff reported that the injection gave her no relief. (Tr. 213).  Lover's physical exam showed no tenderness to palpation at the SI joints, in the lumbar spinous area, or on the paraspinous muscles of the lumbar region.  Lover had full strength in her lower extremities. Lover expressed worry as her ability to afford the spinal cord stimulator and intrathecal pump. Plaintiff had stopped attending physical therapy around April 2010, when her prescription expired, and she had not been performing physical therapy exercises at home.  Dr. Hayek began Plaintiff on Methadone. (*Id.*).  Dr. Hayek adjusted Plaintiff's medication on July 16, 2010, at which time Plaintiff reported continued low back pain radiating into the right ankle. (Tr. 233). On August 4, 2010, Dr. Hayek administered a steroid injection. (Tr. 229).

Plaintiff met with Tony Lababidi, D.O., a pain management specialist, on September 30, 2010. (Tr. 259).  Dr. Lababidi's physical examination showed lumbar facet loading on both sides, sacroiliac ("SI") joint tenderness on both sides, and a stiff, antalgic gait. (Tr. 261).  The doctor scheduled Plaintiff for a SI joint injection, started Plaintiff on a duragesic patch and

---

[2] "Post-laminectomy syndrome," also referred to as "failed back syndrome," is characterized by residual and persistent back and/or leg pain following spine surgery. The Spinal Research Foundation, *available at* http://www.spinerf.org/learn/conditions/post-laminectomy-syndrome-0.

flexeril, and recommended continued use of the TENS unit. (Tr. 264).  On October 28, 2010, Plaintiff reported her pain at a level "5" out of "10." (Tr. 267).  She had SI joint tenderness on both sides, but her straight leg raise test was negative. (Tr. 268).

On November 17, 2010, Curt Ickes, Ph.D., performed a consultative mental health evaluation. (Tr. 250).  While discussing activities of daily living, Plaintiff reported that she spends most of the day at home, and has problems standing or sitting for long periods of time. (Tr. 253).  When performing household chores, Plaintiff stated that she needed to take a break every ten or fifteen minutes due to her back pain. (*Id.*).

Lover saw pain management specialist Dr. Terry Ross on November 15, 2010. (Tr. 287). Plaintiff reported that the October 2010 sacroiliac block provided relief for 1.5 weeks, and a fentanyl patch was ineffective. (*Id.*).  Plaintiff's lumbar spine showed some tenderness to palpation and her range of motion was decreased throughout.  Lover's sensory examination was normal, as was her gait.  Dr. Ross adjusted Lover's medication. (Tr. 288).

On November 29, 2010, Plaintiff underwent an MRI. (Tr. 262-63).  Jane Burk, M.D., compared this MRI to Plaintiff's pre-surgery MRI, which was taken in September 2009. (Tr. 263).  Dr. Burke explained that the updated MRI showed a size reduction of the displaced discs at L2-3 and L3-4.  At the L4-5 level, spinal stenosis had been decompressed by the surgery. There remained shallow disc herniation at L2-3 and L3-4.  There was moderate foraminal narrowing at L3-4, and moderate biforaminal narrowing at L4-5. The L4-5 level showed posterior disc protrusion that was "minimally eccentric right preforaminally," and at L5-S1 there remained shallow disc protrusion near the right S1 nerve. (*Id.*).

Plaintiff continued to attend appointments with doctors at the Comprehensive Pain Management Clinic. In December 2010 and February 2011, Dr. Lababidi adjusted her

medication and administered a sacroiliac injection. (Tr. 290, 296).  On February 15, 2011, Plaintiff had positive SI joint tenderness on the right and a positive straight leg raise test on the right. (Tr. 298).  On March 12, 2011, Dr. Lababidi administered a SI joint injection. (Tr. 300). This injection provided greater than 50 percent relief, but on March 17, 2011, Plaintiff reported to Dr. Ross that the relief was short lived. (Tr. 302).  Dr. Ross's examination resulted in a positive right straight leg raise. (Tr. 303).  Otherwise, Plaintiff had a normal range of motion in her extremities, normal sensory examination, unimpaired reflexes, and a normal gait. (*Id.*).

From April 2011 to October 2011, Lover continued to have positive right SI joint tenderness and positive right straight leg raise tests. (Tr. 306, 309, 314, 323, 328, 333, 337, 340). However, generally, Lover exhibited a normal range of motion and strength in her lower extremities, her reflexes and sensation were intact, and her gait was normal.

Lover received SI joint injections from Dr. Lababidi twice in June 2011. (Tr. 311, 316). Dr. Lababidi also performed a right SI joint a radiofrequency ablation ("RFA"), but Lover reported minimal relief. (Tr. 325, 327).  Dr. Lababidi administered a steroid injection on August 11, 2011, but Plaintiff was returned to the Pain Clinic on September 1, 2011 with SI joint tenderness and a positive straight leg raise. (Tr. 330, 333).  Plaintiff's extremities showed a full range of motion and her gait was normal. (Tr. 333).  In November 2011, Dr. Lababidi approved Lover as a candidate for a spinal cord stimulator implant; however, Lover's insurance denied coverage. (Tr. 346, 351).

Plaintiff had a surgical consultation with Jeffry S. Tharp, D.O., on January 30, 2012. (Tr. 356, 393).  Although her straight leg raise test was negative, Dr. Tharpe concluded that Plaintiff's chronic pain made her a good candidate for invasive pain management. (Tr. 393).

During the examination, Plaintiff's strength was unimpaired in the upper and lower extremities and her pinprick sensation was intact. (Tr. 395).

At Plaintiff's February 2012 treatment session with Maria Griffiths, M.D., a physical examination showed SI joint tenderness on the right and some tenderness and spasms in the lumbar spine, with a decreased range of motion. (Tr. 400).  Lover's neurological examination, coordination, and gait were normal. (*Id.*).

Throughout the relevant period, Lover treated with Tai-Chi Kwok, M.D.  Plaintiff met with Dr. Kwok every six months since December 15, 2006, and the doctor referred Plaintiff to some of the pain specialists and surgeons described herein. (Tr. 318).  On June 24, 2011, Dr. Kwok completed a medical source statement describing Lover's physical impairments. (Tr. 321). Dr. Kwok characterized Plaintiff's prognosis as poor, noting severe lower back pain, numbness in the right leg and half of the left leg, and shooting pain down both legs. (Tr. 318).  He described the pain as constant and throbbing, starting in the lower back and radiating down both legs, with a severity of "10" out of "10."  Under clinical findings and objective signs, Dr. Kwok listed positive straight leg raise test, obvious pain during examination, and an abnormal gait. (*Id.*)

Dr. Kwok made the following findings: Lover could sit for ten minutes at one time before needing to stand, stand for five minutes at a time, and sit for a total of less than two hours in an eight hour working day. (Tr. 319).  Plaintiff must walk for five minutes, every five minutes.  She required unscheduled breaks for 15 minutes, every 15 minutes, due to muscle weakness, chronic fatigue, and pain/paresthesias or numbness. (*Id.*).  Plaintiff could never lift and carry, nor could she twist, stoop, crouch, climb stairs, or climb ladders. (Tr. 320).  Plaintiff could spend ten percent of the day using her hands for grasping objects, fingers for fine manipulations, and arms for reaching in front of the body or reaching overhead.  Dr. Kwok estimated that Plaintiff would

likely be off-task 25 percent or more of the day.  Finally, Lover would likely be absent from work more than four days per month. (*Id.*).

### C.  Plaintiff's Testimony

While before the ALJ, Plaintiff explained that she lives at home with her husband and her son, who is age 30.  (Tr. 29).  She uses her laptop, watches television, reads, and feeds her pets. (Tr. 30).  Her husband performs grocery shopping, cleaning, and gardening. (Tr. 31).  Lover cooks for her family once or twice each week, making meals that can last a few days. (Tr. 35-36).  She cooks while seated in a heavily padded chair with back support and wearing a back brace. (*Id.*).  Plaintiff is able to load the dishwasher and washing machine, as well as fold clothing. (Tr. 29, 35).  Lover sleeps in a reclining chair. (Tr. 37).

Lover testified that she is able to walk a quarter of a block. (Tr. 38).  She can sit for 15 to 20 minutes before needing to walk around for five minutes. (Tr. 39, 43).  She did not have trouble sitting with her arms extended to work on a computer. (Tr. 39).  Plaintiff is able to stand, without holding onto anything for support, for two minutes. (Tr. 40).  Lover climbs the stairs in her home one or twice each day, doing so one foot at a time, bringing the left foot up and then the right, and while holding onto a handrail. (Tr. 38, 40).

### III. SUMMARY OF THE ALJ'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant last met the insured status requirements of the Social Security Act on December 31, 2012.

2.  The claimant has not engaged in substantial gainful activity since June 1, 2008, the alleged onset date.

3.  The claimant has the following severe impairments: degenerative disc disease, lumbar post laminectomy syndrome, lumbosacral neuritis; lumbar radiculopathy; lumbosacral spondylosis with myelopathy; disorders of sacrum.

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  After careful consideration of the entire record, I find that the claimant had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) with the following additional limitations.  The claimant requires a sit stand option, which would allow the individual to stand up from a seated position approximately every twenty minutes and stand for a few minutes before sitting down again.  The claimant can only frequently operat[e] foot controls.  She can occasionally climb ramps and stairs, but can never climb ladders, ropes, or scaffolds.  The claimant can occasionally balance, stoop, kneel, and crouch, but can never crawl.  The claimant must avoid concentrated exposure to workplace hazards such as unprotected machinery and unprotected heights.

6.  The claimant is capable of performing past relevant work as a medical transcriber.  This work does not require the performance of work related activities precluded by the claimant's residual functional capacity.

7.  The claimant has not been under a disability, as defined in the Social Security Act, from June 1, 2008, through the date of this decision.

(Tr. 12-17) (internal citations omitted).

## IV. DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance and/or Supplemental Security Income benefits only when she establishes disability within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423, 1381.  A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months."  *See* 20 C.F.R. §§ 404.1505, 416.905.

## V.  STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards.  *See Cunningham v. Apfel*, 12 F. App'x 361, 362 (6th Cir. 2001); *Garner v. Heckler,*

745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.*

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). However, it may examine all the evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## VI. ANALYSIS

Plaintiff maintains that the ALJ erred in assessing her complaints of pain and other symptoms. In a second allegation of error, Plaintiff asserts that the ALJ failed to appropriately assess the opinion of her treating physician. For the reasons set forth below, remand is warranted.

### A. Plaintiff's Credibility

Plaintiff takes issue with the ALJ's assessment of her complaints of pain and other symptoms. The Court agrees that the ALJ's analysis of Lover's credibility is not supported by substantial evidence.

13

It is the ALJ's responsibility to make decisions regarding the credibility of witnesses, and the ALJ's credibility determinations are generally entitled to considerable deference. *See Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008) (*citing Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)). Notwithstanding, the ALJ's credibility finding must be supported by substantial evidence, *Walters*, 127 F.3d at 531, as the ALJ is "not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.' " *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (*quoting* SSR 96-7p). The ALJ must provide a sufficient explanation for his credibility determination. The determination "must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for that weight." Social Security Ruling ("SSR") 96-7p, 1996 WL 374186, at *4.

In evaluating whether a claimant is disabled by pain, this circuit has established a two part test. *Rogers*, 486 F.3d at 243. The ALJ must consider (1) whether the objective medical evidence supports a finding of an underlying medical condition, and (2) whether the objectively established medical condition is of a level of severity that it can reasonably be expected to produce the claimant's alleged symptoms. *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986); *Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994).

When evaluating the credibility of a plaintiff's allegations of pain, the ALJ should consider a number of factors in addition to the objective medical evidence. *Walters*, 127 F.3d at 531; 20 C.F.R. § 404.1529(c)(2); SSR 96-7p, 1996 WL 374186. These other factors may include: statements from the claimant and the claimant's treating and examining physicians;

diagnoses; efforts to work; the claimant's daily activities; the location, duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; treatment, other than medication, the claimant receives to relieve pain; measures used by the claimant to relieve symptoms; and any other factors concerning functional limitations due to symptoms. *Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); 20 C.F.R. § 404.1529(a).

Here, the ALJ found that Plaintiff had an underlying medically determinable impairment that could reasonably be expected to produce her pain and other symptoms. (Tr. 15).  However, the ALJ concluded the Plaintiff's statements regarding the intensity, persistence, and limiting effects of her symptoms were not credible. (*Id.*).  While the ALJ went on to provide a rationale for discounting Plaintiff, the ALJ's explanation is not substantially supported by the record.

The ALJ discounted Lover's complaints of pain because the record evidence did not "support the specifics" of Lover's allegations. (Tr. 15).  In support of this conclusion, the ALJ pointed to MRI results from before and after Plaintiff's November 17, 2009 back surgery.  A comparison of the images, performed by Dr. Burke, showed the surgery relieved the impingement on the L4 nerve root, decompressed the central canal stenosis, and reduced in size each disc herniation. (Tr. 15, 263).  The ALJ concluded that the MRI results were "in line with the reports that the surgery was successful," and they suggested Plaintiff's symptoms improved after she recovered from the operation. (Tr. 15).  The ALJ also noted that the images contradicted Plaintiff's statement that the surgery, if anything, worsened her condition.  To further support the credibility finding, the ALJ pointed to Plaintiff's straight leg raise testing, which the ALJ explained had "never been particularly indicative of the severe radiculopathy that [Lover] has alleged, and at times has been negative." (*Id.*).

15

The ALJ's reasons for discounting Plaintiff, as set forth above, fail to carry the credibility analysis.  To begin, the ALJ's observation that reports indicated the surgery was successful is unsubstantiated.  The undersigned is unaware of such statements from medical professionals.  As a result, discounting Plaintiff's complaints on the basis of reports that the surgery was successful was inappropriate.

The results of the straight leg raise examinations also do little to show a lack of candor.  The ALJ cites two negative test results, and there appear to be two other instances in the record where Plaintiff exhibited a negative straight leg raise. (Tr. 172, 176, 285, 395).  However, the record is replete with positive straight leg raise results on the right side, even after Plaintiff's surgery. (Tr. 298, 303, 306, 309, 314, 323, 328, 333, 337, 340, 342-3).  The ALJ's failure to acknowledge this significant evidence, which appears to contradict her rationale, renders the ALJ's reasoning questionable, at best.  As a result, the straight leg raise examinations do not substantiate the credibility determination.

Finally, the MRI results, on their own, are insufficient to discredit Lover.  The ALJ is correct in observing that Plaintiff's November 2010 MRI showed reduction in size of each displaced disk and decompression of spinal stenosis at the L4-5 level.  However, though reduced in size, disc herniation remained visible on the MRI at the L2-3, L3-4, L4-5, and L5-S1 levels. (Tr. 262).  Moderate biforaminal narrowing was also present at L4-5. (*Id.*).  As the ALJ herself acknowledged, the 2010 MRI "still show[ed] diffuse pathology throughout the claimant's lumbar spine despite significant improvement since the surgery." (Tr. 16).  Moreover, following post-surgical physical therapy, Lover regularly sought treatment with pain management specialists, underwent numerous epidural injections, and often had medication adjusted.  Partly because this treatment provided limited relief, Plaintiff's physician opined that she was a good candidate for a

spinal cord stimulator.  Thus, without more, the MRI results are insufficient to carry the ALJ's credibility finding.

The Commissioner argues that the absence of significant neurological deficits and Plaintiff's minimal clinical findings support the ALJ's credibility determination. The Commissioner cites to examples of Lover exhibiting full strength in her lower extremities (*see, e.g.*, Tr. 276, 306, 354), intact sensation (*see, e.g.*, Tr. 303, 337, 354), normal reflexes (*see, e.g.*, Tr. 273, 314, 349), and a normal gait (*see, e.g.*, Tr. 303, 314, 343, 400).  While such findings may be reflected in the record, the ALJ did not discuss this evidence or cite to records that set forth all of these clinical results.  Relying on other information in the record to explain the ALJ's credibility determination would require the Court to engage in *post hock* rationalization that is prohibited.  The undersigned's review of the ALJ's decision is limited to consideration of the reasoning supplied by the ALJ. *See Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 192 (6th Cir. 2009); *Martinez v. Comm'r of Soc. Sec.*, 692 F. Supp. 2d 822, 826 (N.D. Ohio 2010).  In the present case, the ALJ's explanation for discounting Lover's statements does not substantially support the credibility finding, and the ALJ's opinion otherwise fails to make sufficiently clear why Lover's credibility was discounted.  Accordingly, remand is appropriate.

Additionally, Lover asserts that when making the credibility determination, the ALJ failed to look beyond the objective medical evidence and consider the factors delineated in the regulations and SSR 96-7p.  The ALJ's opinion reflects that ALJ accounted for some of the factors.  For example, the ALJ discussed Plaintiff's daily activities and some of the physical limitations she expressed in her testimony. (Tr. 16).  Nevertheless, given that remand appropriate, the ALJ should reassess Plaintiff's credibility with attention toward the applicable

credibility factors.  If upon remand the ALJ finds that Plaintiff's statements are not fully credible, the ALJ ought to provide an explanation that is supported by the record.

### B.  Treating Physician Dr. Kwok

Lover contends that the ALJ erred in failing to grant controlling weight to the opinion of her treating physician, Dr. Kwok.  Dr. Kwok began treating Plaintiff around December 2006. (Tr. 318).  In June 2011, the doctor completed a medical source statement describing his opinions as to the extent of Plaintiff's physical limitations. (Tr. 318-21).  The ALJ evaluated Dr. Kwok's medical source statement and assigned "little weight" to the doctor's opinion. (Tr. 16).

When assessing the medical evidence contained within a claimant's file, it is well-established that an ALJ must give special attention to the findings of the claimant's treating source.  *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  The treating source doctrine recognizes that physicians who have a long-standing treating relationship with an individual are better equipped to provide a complete picture of the individual's health and treatment history.  *Id.*; 20 C.F.R. § 404.1527(c)(2).  Under the Social Security Regulations, opinions from such physicians are entitled to controlling weight if the opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2).

The treating source's opinions are not entitled to such deference, however, if they are unsupported by the medical data in the record, or are inconsistent with the other substantial evidence in the record.  *See Miller v. Sec'y of Health & Human Servs.*, No. 91-1325, 1991 WL 229979, at *2 (6th Cir. Nov. 7, 1991) (Table).  When the treating physician's opinions are not entitled to controlling weight, the ALJ must apply specific factors to determine how much weight to give the opinion.  *Wilson*, 378 F.3d at 544, *see* 20 C.F.R. § 404.1527(c)(2)-(6).  The

regulations also advise the ALJ to provide "good reasons" for the weight accorded to the treating source's opinion. 20 C.F.R. § 404.1527(c). Regardless of how much weight is assigned to the treating physician's opinions, the ALJ retains the power to make the ultimate decision of whether the claimant is disabled. *Walker v. Sec'y of Health & Human Servs.*, 980 F.2d 1066, 1070 (6th Cir. 1992) (*citing King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984)).

In the present case, Plaintiff contends that the ALJ failed to give "good reasons" for discounting the opinion of Dr. Kwok. The ALJ gave little weight to the doctor's opinion on two grounds. (Tr. 16). First, because Dr. Kwok based his opinions, in part, on Plaintiff's subjective reports that "her pain is constantly a 10 in severity on a scale of 1 to 10." (*Id.*). Because remand is necessary for the ALJ to reevaluate Plaintiff's credibility, the Court will not speak to the first reason the ALJ provided for discounting Dr. Kwok. This reason turns, in part, on Plaintiff's credibility, and could be affected by the subsequent credibility analysis.

Notwithstanding, the remainder of the ALJ's treating physician analysis draws into question the accuracy of Dr. Kwok's assessment and sufficiently supports the ALJ's finding. (Tr. 16). The ALJ also questioned Dr. Kwok's opinion because the limitations set out in the medical source statement conflicted with Plaintiff's testimony at the hearing and her activities of daily living. The ALJ went on to provide examples of how such testimony and activities contradicted the medical source statement. (*Id.*). These examples demonstrate that Dr. Kwok overestimated Plaintiff's limitations.

For instance, Dr. Kwok opined that Plaintiff was significantly restricted in reaching, handling, and fingering; she could use her arms, hands, and fingers for only ten percent of a workday. (Tr. 16, 320). However, as the ALJ explained, Plaintiff's testimony undermines this restriction. (Tr. 16). Lover stated that she could prepare meals, separate and fold laundry, load a

19

dishwasher, and extend her arms without discomfort to work on a computer. (Tr. 29, 35, 39-40). The record appears to contain no indications from Plaintiff, or her physicians, that Plaintiff is significantly impaired in this regard.  Additionally, Dr. Kwok opined that Plaintiff would need to walk every five minutes; yet, Plaintiff testified that she can sit for 15 to 20 minutes before she must stand or walk. (Tr. 16).

Dr. Kwok also opined that Plaintiff could sit for less than a total of two hours in an eight hour workday.  However, Lover indicated that she spent more than two hours during the day in a seated position while performing activities. (Tr. 16).   The ALJ explained that Lover "works on her laptop in a seated position for a total of three to four hours per day in addition to engaging in other activities throughout the day while sitting, such as preparing meals, watching television, and reading." (*Id.*).  It is correct that on a daily basis, Plaintiff uses her computer in a seated position for three to four hours, over the course of a 12 to 15 hour day. (Tr. 37).  In addition, Plaintiff indicated that once or twice each week, she cooks bulk meals while seated. (Tr. 35-36). While Plaintiff also reads and watches television, she did not indicate whether she did so in a seated or reclined position. (Tr. 30).   Nonetheless, when taken together, Lover's testimony regarding the amount of time she uses a computer and cooks while seated, calls into question Dr. Kwok's opinion that she could sit for less than two hours during an eight hour day.

Additionally, the ALJ questioned Dr. Kwok's assessment of Plaintiff's ability to climb stairs. (Tr. 16).  The medical source statement set out a scale rating how often a person could perform specific activities, ranging from "never, rarely, occasionally, to frequently." (Tr. 320). Dr. Kwok opined that Lover could "never" climb stairs. (*Id.*).  During the hearing, Plaintiff stated that she used the stairs in her home one or twice each day.  (Tr. 40).  While Plaintiff testified that she climbs stairs one foot at a time, with assistance of the handrail, she was capable of climbing

20

stairs, unlike Dr. Kwok's opinion that she could never do so.  As a result, Dr. Kwok's finding on this matter reasonably called into question the accuracy of the medical source statement. Overall, the ALJ illustrated that Dr. Kwok's opinion included limitations that were overly restrictive, given Plaintiff's descriptions of her abilities and daily activities.

Plaintiff asserts that Dr. Kwok answered questions regarding Plaintiff's abilities in a competitive work setting, which would not comport with what Plaintiff could do in her home environment.  Lover maintains that, as a result, it was inappropriate for the ALJ to discredit Dr. Kwok based on her daily activities.  While it is true that there are differences between work and home, the ALJ was permitted to weigh the treating physician's opinion against other evidence in the record, including Plaintiff's assertions as to her daily activities.  The ALJ reviewed Plaintiff's self-assessment as to her abilities and testimony regarding her daily activities and found that in many regards, they did not comport with Dr. Kwok's medical source statement.  Plaintiff does not point to case law supporting her proposition that the ALJ erred in this regard.  Accordingly, the ALJ's decision with regard to Dr. Kwok is supported by substantial evidence.

## VII.  DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is not supported by substantial evidence.  Accordingly, the final decision of the Commissioner is REVERSED and REMANDED for further proceedings.

IT IS SO ORDERED.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date: June 18, 2014.

21